UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| S&S STEEL SERVICES, INC. | ) | CASE NO. 15-07401-JJG |
| | ) | CHAPTER 11 |
| Debtor. | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO DEBTOR'S "MOTION TO APPROVE (A) THE SALE OF CERTAIN
OF S&S STEEL SERVICES, INC.'S ASSETS FREE AND CLEAR OF ALL LIENS,
CLAIMS, INTERESTS AND ENCUMBRANCES PURSUANT TO 11 U.S.C. § 363, WITH
VALID LIENS TO ATTACH TO THE PROCEEDS OF THE SALE; (B) THE DEBTOR'S
ENTRY INTO AND PERFORMANCE OF ITS OBLIGATIONS UNDER THE ASSET
PURCHASE AGREEMENT; AND (C) RELATED RELIEF"**

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   STATEMENT OF FACTS ..................................................................... 4

    A.    The Debtor And Other Sharp-Controlled Affiliates Enter Into Loans With The Bank; Sharp Personally Guarantees The Loans................................................. 4

    B.    Sharp Enters Into Post-Petition Settlement Agreement With The Bank, Rewarding Him For Managing The Debtor To The Bank's Benefit. ..................... 5

    C.    Sharp Proposes Sale Of The Debtor's Most Profitable Facility/Assets At Fire-Sale Prices, On Shortened Notice With No Market Testing, In Flagrant Violation Of His Fiduciary Duties........................................................... 7

    D.    Sharp And The Bank Devise The Sale/Abandonment/CLO/Dismissal Strategy To Give The Bank The Benefit Of Bankruptcy And Protect Sharp From Substantial Causes Of Action, All At The Expense Of Unsecured Creditors................................................................................................. 10

III.  ARGUMENT ................................................................................ 14

    A.    The Debtor Has Not Proposed The Sale In Good Faith And Wholly Fails To Meet Its Burden Of Demonstrating That The Sale Is Backed By A Sound Business Justification................................................................... 14

        1.    Sharp's Self Interest Is Driving The Proposed Sale, In Total Breach Of His Fiduciary Duties................................................................ 16

        2.    The Debtor Has Presented Zero Evidence Of A Need For Speed. ........... 18

        3.    The Proposed Sale Includes The Debtor's Crown Jewel Assets. ............. 18

        4.    The Assets Were Not Marketed At All, Much Less Aggressively: The Proposed Sale Is "Private" And The APA Forbids Competitive Bidding.................................................................................. 18

        5.    The Proposed Sale Benefits Only Sharp And The Bank. ........................ 21

        6.    The Debtor Has Not –And Cannot – Offer Any Sound Business Justification For Selling Its Assets At Fire-Sale Prices. .......................... 24

7.      In Trying To Push Through A Private Sale On Shortened Notice And Truncated Service, The Debtor Abuses The Bankruptcy Process. ................................................................................... 26

B.      The Debtor Provides No Basis To Waive The Stay. .............................................. 27

IV.    CONCLUSION.............................................................................................................. 28

I\8238892.1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

In re Abbotts Dairies of Pa., Inc.,
    788 F.2d 143 (3d Cir. 1986)......................................................21

In re After Six, Inc.,
    154 B.R. 876 (E.D. Pa. 1993) ..................................................26

In re Bakalis,
    220 B.R. 525 (Bankr. E.D.N.Y. 1998).......................................25

In re Big Rivers Elec. Corp.,
    233 B.R. 739 (W.D. Ky. 1998) ................................16, 19, 20

In re Bombay Co., Inc.,
    No. 07-44061-DML-11, 2007 WL 2826071 (Bankr. N.D. Tex. Sept. 26, 2007) ...................27

In re Borders Group, Inc.,
    453 B.R. 477 (Bankr. S.D.N.Y. 2011).......................................27

In re Brethren Care of S. Bend, Inc.,
    98 B.R. 927 (Bankr. N.D. Ind. 1989)........................................16

In re Cloverleaf Enters., Inc.,
    No. 09-20056, 2010 WL 1445487 (Bankr. D. Md. Apr. 2, 2010) ...............14, 17, 20

In re Cont'l Air Lines, Inc.,
    780 F.2d 1223 (5th Cir. 1986) .................................................15

Corp. Assets, Inc. v. Paloian,
    368 F.3d 761 (7th Cir. 2004) ...................................................18

DiMarco v. Flannery (In re Flannery),
    11 B.R. 974 (Bankr. E.D. Pa. 1981) ........................................25

In re Duro Indus., Inc.,
    No. 02-16131-CJK, 2002 WL 34159091 (Bankr. D. Mass. Oct. 7, 2002) .............19

In re Encore Healthcare Assoc.,
    312 B.R. 52 (Bankr. E.D. Pa. 2004) ...............................15, 22, 23

In re Family Christian, LLC,
    533 B.R. 600 (Bankr. W.D. Mich. 2015)...........................16, 19, 23

In re Fremont Battery Co.,
  73 B.R. 277 (Bankr. N.D. Ohio 1987) .....................................................................23

In re Gulf Coast Oil Corp.,
  404 B.R. 407 (Bankr. S.D. Tex. 2009) ..........................................14, 15, 16, 18, 19, 22, 24, 26

In re Hart's Mfg. Co., Inc.,
  383 B.R. 720 (Bankr. W.D. Tenn. 2008) ..................................................................20, 22, 24

In re Integrated Agri, Inc.,
  313 B.R. 419 (Bankr. C.D. Ill. 2004) .....................................................................21

In re Lionel Corp.,
  722 F.2d 1063 (2d Cir. 1983) ..............................................................................14, 16, 18, 21

In re LWD, Inc.,
  332 B.R. 543 (Bankr. W.D. Ky. 2005) ...................................................................16

In re Med. Software Solutions,
  286 B.R. 431 (Bankr. D. Utah 2002) ...............................................................18, 23

In re NEC Holdings Corp.,
  Case No. 10-11890 (CSS) (Bankr. D. Del.)............................................................23

In re Prairie Coal Co.,
  40 F.Supp. 894 (E.D. Ill. 1941).............................................................................26

In re PSINet Inc.,
  268 B.R. 358 (Bankr. S.D.N.Y. 2001)...................................................................28

In re Rock Indus. Mach. Corp.,
  572 F.2d 1195 (7th Cir. 1978) ............................................................................21

In re S.N.A. Nut Co.,
  186 B.R. 98 (Bankr. N.D. Ill. 1995) ..............................................................16, 24

In re Schipper,
  933 F.2d 513 (7th Cir. 1991) ..................................................................14, 16, 17

In re Terrace Chalet Apartments, Ltd.,
  159 B.R. 821 (N.D. Ill. 1993) ...............................................................................21

In re Tiara Motorcoach Corp.,
  212 B.R. 133 (Bankr. N.D. Ind. 1997).................................................................25

In re UAL Corp.,
  443 F.3d 565 (7th Cir. 2006) ...............................................................................14

In re W. Biomass Energy LLC,
    No. 12-21085, 2013 WL 4017147 (Bankr. D. Wyo. Aug. 6, 2013) .................................. 22-23

**Statutes**

11 U.S.C. § 363 ..................................................................................................... passim

11 U.S.C. § 363(b) .................................................................14, 15, 16, 19, 22, 25, 27

11 U.S.C. § 363(m) ...........................................................................................................20

11 U.S.C. § 1107 ................................................................................................................4

11 U.S.C. § 1108 ................................................................................................................4

**Rules**

Bankruptcy Rule 6004(h)...........................................................................................27, 28

Bankruptcy Rule 6006(d)...........................................................................................27, 28

**Other Authorities**

3 COLLIER ON BANKRUPTCY ¶ 363.02 (Alan N. Resnick & Henry J. Sommer eds.,
    16th ed.) ...........................................................................................................15, 22

I\8238892.1

The Official Committee of Unsecured Creditors (the "Committee") of S&S Steel Services, Inc., debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), by and through its counsel, Ice Miller LLP and Fox Rothschild LLP, hereby objects (the "Objection") to the *Debtor's Motion To Approve (A) The Sale Of Certain Of S&S Steel Services, Inc.'s Assets Free And Clear Of All Liens, Claims, Interest And Encumbrances Pursuant to 11 U.S.C. § 363, With Valid Liens To Attach To Proceeds Of the Sale; (B) The Debtor's Entry Into And Performance Of Its Obligations Under The Asset Purchase Agreement; And (C) Related Relief* [Dkt. No. 141] (the "Sale Motion").

This Objection is made and based upon the following memorandum of points and authorities, the *Affidavit of Alexander A. Calderone* (the "Calderone Affidavit") filed concurrently herewith,[1] the papers and pleadings on file with the Court in the Chapter 11 Case, the arguments and representations of counsel, and any oral or documentary evidence presented by the Committee at or prior to the time of the hearing on the Sale Motion.

In support of its Objection, the Committee respectfully represents as follows:

## I.      PRELIMINARY STATEMENT

1.      The Committee is not opposed to this Court's conducting a sale of the Debtor's assets.  In fact, the Committee itself suggested such a sale to both the Debtor and the Bank[2] based on the fact that buyers are often willing to pay a premium to receive the high level of protection afforded under Section 363 of the Bankruptcy Code.  However, the Debtor and the Bank rejected this suggestion as an expensive process, not worth their time and consideration.  In essence, they did not want to "pay the freight" associated with a sale conducted in

---

[1] The exhibits attached to the Calderone Affidavit have been redacted as required by Fed. R. Bankr. P. 9037 and the Debtor's request.   The Committee can produce unredacted copies pursuant to an order or request by the Court.

[2] Capitalized terms not defined above are defined below.

I\8238892.1

Court.  Consequently, the Bank received stay relief pursuant to the Fifth Interim Order [Dkt. No. 148], and the Debtor filed a motion to appoint a CLO to liquidate the Debtor's (and its Affiliated Entities') assets, presumably outside of the bankruptcy process [Dkt. No. 123, amended, Dkt. No. 139].  As explained below, the Debtor's principal (Mr. Sharp) was motivated to file the CLO Motion based on a deal he recently struck with the Bank that reduces his personal guaranty obligations if he causes the Debtor to do certain things, including getting a CLO appointed and liquidating its assets.

2.    Nevertheless, the day before Christmas Eve, the Debtor informed the Committee that it had found a buyer for a substantial portion of its operating assets – the profitable portion of the Debtor's business – but needed to move quickly to have the sale approved by the Court.  The buyer is an existing creditor that owns a similar and competitive business.  The Debtor gave no reason for the rush in closing the sale – but led the Committee to believe that it had to do with the Bank's refusal to allow the Estate to use cash subject to the Bank's lien.  At the same time, the Sale Motion represents that the Secured Lender has consented to this sale, together with the sale of certain non-debtor assets (the real estate upon which the Debtor's operating assets sit).  So, even though the Bank has approved the sale of the Debtor's assets in bankruptcy, by seeking to prevent any recovery to other creditors, the Bank is still refusing to "pay the freight."

3.    The Proposed Sale should be denied for a myriad of reasons, among the following:

A.    The Debtor seeks to conduct a private sale of its crown jewel assets over Christmas and New Year's, effectively leaving seven business days between filing and closing.  Any argument that this truncated schedule is necessary to preserve a "going concern"

2

I\8238892.1

operation is wholly refuted by the fact that the Buyer is offering *considerably less than liquidation value* for the assets. Moreover, during this time, there were several days in which the business was not even open for potential purchasers to see the equipment in operation. For this reason alone, the Proposed Sale must be denied.

B.       The Debtor has offered no evidence of any market testing, robust marketing effort or open sales process. It is no wonder because, as of last month, the Debtor intended to reorganize. Only this month – after Sharp signed a deal to liquidate assets for the Bank – did the Debtor decide to start selling off its assets. Even on virtually no notice or opportunity for due diligence, several parties have expressed an interest in bidding on the Assets to counsel for the Committee, including two that have come through the Committee itself. For this additional reason, the Proposed Sale must be denied.

C.       The only creditor to benefit from the Proposed Sale – in direct contravention of Seventh Circuit law – is the Bank. A private sale that has not been marketed cannot be approved at all, much less when the only beneficiary of the sale process is a secured lender and the estate's other stakeholders receive nothing. The Bank has stay relief and the ability to exercise its rights with respect to its collateral under State law. Accordingly, the Bank should not receive the benefits of a section 363 sale process without assuming the obligations that are inherent in the privilege. To ask the Court to sanction the Proposed Sale is an abuse of the bankruptcy process. For this third reason, the Proposed Sale must be denied.

D.       Finally, the motivating force behind the Proposed Sale is Sharp's abandonment of his fiduciary duties in pursuit of his own self-interest. The Settlement Agreement between the Bank and Sharp – signed about a month ago, but only now disclosed to the Court (by the Committee) – provides that Sharp can reduce his obligations on his Guaranty upon achieving

I\8238892.1

certain milestones, including the appointment of a CLO and the liquidation of the Bank's collateral – all as guided by the Bank. As such, Sharp is no longer acting in the best interests of the Estate, but rather in his own self-interest. For all of the reasons given above, the Proposed Sale must be denied.

## II.    STATEMENT OF FACTS

4.    On August 31, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Since the Petition Date, the Debtor has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.    On September 16, 2015, the Unites States Trustee appointed the Committee.

6.    On November 19, 2015, this Court entered: (a) an order approving Ice Miller LLP's retention as the legal counsel to the Committee, *nunc pro tunc* to September 22, 2015 [Dkt. No. 104]; (b) an order approving Fox Rothschild LLP's retention as the legal counsel to the Committee, *nunc pro tunc* to September 21, 2015 [Dkt. No. 102]; and (c) an order approving the retention of Calderone Advisory Group, LLC ("Calderone") as the financial advisor to the Committee, *nunc pro tunc* to September 23, 2015 [Dkt. No. 103].

### A.    The Debtor And Other Sharp-Controlled Affiliates Enter Into Loans With The Bank; Sharp Personally Guarantees The Loans.

7.    Upon information and belief, Barry G. Sharp ("Sharp") majority owns and controls the Debtor. Sharp also controls and holds ownership stakes in the following non-Debtor affiliates: Z & S Sharp Real Estate, Inc. ("Z&S"), Nahum Enterprises, LLC ("Nahum"), and SAS, LLP ("SAS") (collectively, the "Affiliated Entities"). The Debtor and the Affiliated Entities are joint and several borrowers (together, the "Borrowers") on loans (the "Loans") from Wells Fargo Bank (the "Bank"), in the original aggregate principal amount of $15.94 million and

I\8238892.1

aggregating approximately $8.8 million as of December 27, 2015. As security for payment of the Loans, on or about July 25, 2014, the Borrowers granted the Bank a security interest in substantially all of their personal property and certain real property (the "Borrower Collateral"). In addition, another non-Debtor controlled by Sharp, Lead Dog Transport, LLC ("Lead Dog"), granted the Bank a security interest in substantially all of its personal property (the "Lead Dog Collateral" and, together with the Borrower Collateral, the "Collateral"). See Calderone Affidavit, ¶¶ 7-8.

8.     Upon information and belief, as further security for payment of the Loans, on or about June 3, 2014, Sharp executed a personal guaranty (the "Guaranty") in favor the Bank, unconditionally guaranteeing all of the Borrowers' obligations under the Loans, up to the amount of $500,000, plus certain accrued and unpaid interest and other expenses. See Calderone Affidavit, ¶ 9.

**B.     Sharp Enters Into Post-Petition Settlement Agreement With The Bank, Rewarding Him For Managing The Debtor To The Bank's Benefit.**

9.     Upon information and belief, on or about December 7, 2015 – just over three months after the Petition Date – Sharp signed a settlement agreement with the Bank (the "Settlement Agreement"), a copy of which is annexed to the Calderone Affidavit as Exhibit "A."

10.     The Settlement Agreement permits Sharp to pay the Bank $500,000 (the "Settlement Amount") in full settlement of his obligations under the Guaranty. In addition, the Settlement Agreement enables Sharp to reduce the Settlement Amount if certain conditions are fulfilled, including: (a) the appointment of a Chief Liquidating Officer ("CLO") over the Debtor's estate; and (b) the liquidation of all of the Collateral (including the Debtor's assets) "under a timeline acceptable" to the Bank. Settlement Agreement, pp. 3-4, ¶¶ 2 & 3.

I\8238892.1

11.     The Settlement Amount can also be reduced to zero if, after the liquidation of all of the Collateral, the Bank's loss is less than or equal to $1,500,000. Settlement Agreement, p. 4, ¶ 3(a)(iv).    In other words, as soon as the Bank collects approximately $7.3 million on liquidation of its Collateral, Sharp will be relieved of all liability on his Guaranty.

12.     As part of the Settlement Agreement, the Bank fully released Sharp with respect to his obligations concerning the Loans (other than the Settlement Amount, as discussed above). Settlement Agreement, pp. 5-6, ¶ 7.

13.     A few days after signing the Settlement Agreement, Sharp caused the Debtor to file its *Motion for Order Authorizing the Appointment of Robert Miles of Focus Management Group USA, Inc. as Chief Liquidation Officer for the Debtor in Possession* [Dkt. No. 123] (the "CLO Motion"), as amended [Dkt. No. 139].    The CLO Motion raises the specter of a "structured dismissal" of the Debtor's case.    See id. [Dkt. No. 139], ¶ 14.    The CLO Motion is set for hearing on January 13, 2015, five days after the Sale Motion.    If the Court approves the CLO Motion, Sharp will receive a $150,000 reduction of the Settlement Amount.    See Settlement Agreement, pp. 3-4, ¶ 3(a)(ii).

14.     Less than two weeks after signing the Settlement Agreement, Sharp caused the Debtor to: (a) enter in the "Asset Purchase Agreement" (the "APA"), annexed as Exhibit A to the Sale Motion, with SSSS Acquisition, LLC, an affiliate of Mill Steel Company (the "Buyer"); and (b) file the Sale Motion, seeking to sell a significant portion of the Debtor's tangible personal property, leasehold improvements and intangible assets (the "Assets") for approximately $860,000.    The closing of the Sale is also conditioned upon an affiliate of the Buyer being able to simultaneously consummate the purchase of the Debtor's most profitable facility (located at 415-433, 416 and 444 East 29th Street, Anderson, Indiana 46015) (the "Facility") for $750,000,

pursuant to the terms of a separate real estate purchase agreement entered into with Z&S. As soon as Sharp liquidates all of the Collateral, including the Facility, he will receive a $150,000 reduction of the Settlement Amount. See Settlement Agreement, p. 4, ¶3(a)(iii). As noted above, when the proceeds collected from all the Collateral total approximately $7.3 million, Sharp will be relieved of all liability on his Guaranty. See Settlement Agreement, p. 4, ¶3(a)(iv).

**C. Sharp Proposes Sale Of The Debtor's Most Profitable Facility/Assets At Fire-Sale Prices, On Shortened Notice With No Market Testing, In Flagrant Violation Of His Fiduciary Duties.**

15.    The Sale Motion, skeletal as it is, belies four important facts that are fatal to its approval: (1) that the sale is "private" – meaning no market testing; (2) that the sale involves all Assets at the Debtor's profitable Facility, including the associated real estate from Z&S; (3) that the Sale's purported justification is the Buyer's maintenance of a "going concern" and thereby preserving jobs, etc.; and (4) yet, that the Buyer is paying rock-bottom liquidation prices for the Assets on a piece meal basis, not a going concern price for the Facility as a whole.

16.    *First*, and most importantly, the APA makes the Sale conditioned on the Bankruptcy Court approving "a **private sale** directly to Buyer and **without any competitive bidding process or auction** . . . ." See APA (Exhibit A to Sale Motion), at p. 5, § 3.1(f) (emphasis added).

17.    The Sale Motion offers **absolutely no evidence that the Sale has been market tested**, only the Debtor's bald assertion that "[t]he Buyer's offer for the Sale Assets is the highest, best, and only acceptable offer for the Sale Assets." Sale Motion, p. 4, ¶ 18. At the same time, **the terms of the APA itself preclude competitive bidding**.

18.    As noted above, despite the lack of adequate notice and opportunity for due diligence, several parties have expressed an interest in bidding on the Assets to counsel for the Committee, including two that have come through the Committee itself. Thus, the APA's ban on

7

I\8238892.1

bidding prevents the Debtor from maximizing the value of the Sale Assets – in direct violation of its fiduciary duty to do so.

19.     *Second*, Exhibit 1.1 to the APA makes clear that the Buyer is seeking to purchase the **entire Facility** – confirmed by the condition that the Buyer's affiliate simultaneously purchase the real estate associated therewith from Z&S.  See APA (Exhibit A to Sale Motion), at p. 5, § 3.1(e), and Exhibit 1.1 thereto.  In other words, the Buyer is purchasing a "turn-key" operation – a fully operational facility that will become "**a branch location of its business**." Sale Motion, p. 4, ¶ 16 (emphasis added).

20.     *Third*, the proffered terse business justification for the Sale also confirms that the Buyer intends to purchase a going concern: "This transaction is expected to save a significant number of jobs in the Anderson area, preserve the tax base for the community, and preserve a viable customer for the current venders to S&S Steel."  Id.  At the same time, the Buyer has promised to employ **only four** members of the Debtor's management.  See APA (Exhibit A to Sale Motion), at p. 6, § 3.1(k).

21.     *Fourth*, despite the Debtor's representation that the Buyer is purchasing a going concern, the Buyer is seeking to pay **rock-bottom liquidation prices** for the Facility.  The APA assigns a total value of $860,000 to a significant portion of the Debtor's tangible personal property, leasehold improvements, and intangible assets.  However, an appraisal dated June 11, 2014 that was conducted by Sector 3 Appraisals, Inc. (the "Asset Appraisal") assigns gross orderly and forced liquidation values of at least **$1,488,650** and **$1,133,230**, respectively, to these same Assets.  Moreover, given that there are a number of items contemplated by the APA that are not included in the Asset Appraisal, it is likely that the appraised value of the Assets even exceeds the range given above.  See Calderone Affidavit ¶ 14 and Exhibit "B" thereto.

I\8238892.1

22.     Furthermore, the APA assigns a value of $.04/lb. to all of the Debtor's raw flat rolled steel inventory existing as of the closing date, excluding finished goods. Based on the current steel market and a review of historical transactions conducted by the Debtor, the Committee believes that $.04/lb. represents pricing that barely exceeds (and may even be less than) current "scrap" rates. Given that the Debtor currently possesses 11,743,696 million pounds of raw material inventory, the difference between the Debtor's book value of raw material inventory and raw material inventory at $.04/lb. pricing is a staggering **$1,273,506.13**. As recently as November 16, 2015, the Debtor itself indicated that a mark-to-market adjustment to the Debtor's book value of inventory was not necessary. Notably, even the Debtor's own wind-down budget (which is dated December 3, 2015) suggests that *50% of raw material inventory can be sold for $.12/lb. and that raw materials are currently being purchased for $.15/lb.* See Calderone Affidavit ¶ 15 and Exhibits "C" & "D" thereto.

23.     Lastly, the APA's closing is conditioned upon an affiliate of the Buyer being able to simultaneously consummate the purchase of the real estate associated with the Facility for $750,000, pursuant to the terms of a separate real estate purchase agreement with Z&S. The Committee is in possession of an appraisal dated May 1, 2014 (the "Real Estate Appraisal"), which appears to assign a value of **$1,294,000** to this same property. Moreover, the Debtor's own wind-down budget once again assigns a liquidation price to this property that exceeds the purchase price – this by at least $450,000. See Calderone Affidavit, ¶ 16 and Exhibit "E" thereto.

24.     Although the Debtor contends that the unsecured creditors receive no recovery under every projected liquidation scenario, the effect of even minor corrections to certain of the Debtor's assumptions quickly results in two of three orderly liquidation scenarios indicating that

I\8238892.1

assets are available for distribution to unsecured creditors, ranging between $519,000 and $1,350,000 – even before considering any potential avoidance or other cause of action proceeds.[3] See Calderone Affidavit, ¶¶ 17-20.

> **D.**   **Sharp And The Bank Devise The Sale/Abandonment/CLO/Dismissal Strategy To Give The Bank The Benefit Of Bankruptcy And Protect Sharp From Substantial Causes Of Action, All At The Expense Of Unsecured Creditors.**

25.    The same date that Sharp caused the Debtor to file the Sale Motion, the Bank filed its *Well Fargo Bank, National Association's Motion For Abandonment Pursuant To 11 U.S.C. § 554* [Dkt. No. 142] (the "Abandonment Motion"), seeking to have the Debtor abandon whatever assets remain in its possession after the Sale.  The Abandonment Motion is set for hearing on January 13, 2015, five days after the Sale Motion.

26.    The Bank also filed its *Joinder of Wells Fargo Bank, National Association To United States Trustee's Motion To Convert Or Dismiss* [Dkt. No. 128], seeking dismissal of the Debtor's case.  The United States Trustee's *Motion To Convert Or Dismiss* [Dkt. No.127] (the "Dismissal Motion") is set for hearing on January 13, 2015, five days after the Sale Motion.

27.    In sum, the Debtor and the Bank together have filed the following four motions: the Sale Motion, the Abandonment Motion, the CLO Motion, and a joinder in the Dismissal Motion (the "Four Motions").

28.    What the Bank stands to gain from the Four Motions is self-evident:  (1) the benefit of selling the Facility with the bankruptcy protections afforded by section 363 (free and clear of liens, shielded from reversal, etc.); (2) the benefit of whisking away the balance of the assets from the Estate to protect the Bank from surcharge of its Collateral; (3) the benefit of a bankruptcy court appointed CLO to liquidate Collateral owned by the non-Debtor Affiliated

---

[3] Moreover, there may be unencumbered assets – such as vehicles – in the Estate that can be used to satisfy unsecured creditors' claims.

I\8238892.1

Entities and avoid messy/costly foreclosure procedures; (4) the benefit of a "structured" dismissal, preserving all of the findings concerning the validity of the Bank's liens contained in the cash collateral orders; and (5) the benefit of Sharp's continuing assistance to sell its Collateral as motivated by his desire to be released from his personal Guaranty under the terms of the Settlement Agreement.

29.    As discussed above, Sharp stands to gain a complete financial release from his Guaranty.  In addition, he may also successfully evade liability for significant insider causes of action if the Four Motions' strategy succeeds.  If the Estate abandons its causes of action against Sharp and the Affiliated Entities, including post-petition breach of fiduciary duty and unjust enrichment claims, creditors will be denied any effective means to prosecute them.  And if the Bankruptcy Case is dismissed, all of the Estate's chapter 5 causes of action against Sharp and the Affiliated Entities will vanish.  The Committee believes that these causes of action may be significant and provide a substantial return for its constituency.

30.    For example, after conducting an initial review of the Debtor's books and records, the Committee's financial advisor discovered that the Debtor appears to have transferred over $10,500,000 to the Affiliated Entities since September 2011.  Of this amount, approximately $2,500,000 occurred in the year before the Petition Date, including over $460,000 in the 90 days before the Petition Date alone.  See Calderone Affidavit, ¶ 25 and Exhibit "G" thereto.

31.    In addition, a review of the Debtor's September 30, 2015 Trial Balance indicates that each of the Affiliated Entities owes the Debtor significant amounts of money, although such indebtedness was never disclosed within the Debtor's bankruptcy schedules.  For instance, Z&S owes the Debtor $1,003,105.38; Nahum owes the Debtor $971,148.77; and Lead Dog owes the Debtor $89,250.  See Calderone Affidavit, ¶ 31 and Exhibit "J" thereto.

I\8238892.1

32.    In light of the above, the Committee has repeatedly requested an accounting of all transactions with the Affiliated Entities, along with their historical financial statements for the four years preceding the Petition Date, among other information.  Based on the significant dollar value associated with these transactions (over $10,500,000 in intercompany transfers since September 2, 2011, of which $2,500,000 were made in the year before the Petition Date, and $460,000 in the 90 days before the Petition Date; and over $2 million in intercompany indebtedness), it is possible that significant causes of action exist against Sharp, the Affiliated Entities, and other insiders.  Until recently, the Committee's requests for information have been refused.  Only a few days ago – on the eve of the Hearing – did the Debtor respond to the Committee's Subpoena by providing 2,000 largely irrelevant pages of information regarding the transactions in question.  Notably, most of the information is in summary form and very difficult to interpret without the ability to conduct further discovery and corroborate evidence with fact witness depositions.  See Calderone Affidavit, ¶ 23.

33.    Based on the information provided to date, it appears likely that the Debtor has entered into numerous transactions with the Affiliated Entities that required the Debtor to pay above-market rates, including wildly fluctuating rent to Z&S.  For instance, Mr. Sharp has admitted to conducting business with at least one of the Affiliated Entities "on terms that were less favorable to the [Debtor] than would have been obtained in an arm's length transaction with a non-Affiliated Person."  See Calderone Affidavit, ¶¶ 26-27 and Exhibit "H" thereto, at p. 5, ¶ K.

34.    The Debtor's historical books and records also indicate that Sharp and other insiders, including Shannon Sharp and Zachary Sharp, appear to have engaged in the practice of loaning money to the Debtor that accumulated interest at particularly high (at least 12% per

I\8238892.1

annum) rates of return. Although the related party loan account detail provided by the Debtor pursuant to the Committee's Subpoena fails to identify these transactions, the Debtor's historical financial statements indicate that in 2012, Mr. Sharp, alone, allegedly loaned[4] the Debtor $705,000 and was repaid $966,064. In 2013, Mr. Sharp allegedly loaned the Debtor $1,083,423 and was repaid $1,258,109. Given that the historical financial statements indicate that the Company's bank debt was priced at 3.75% per annum during these same periods, it is highly questionable whether such transactions were in-fact loans, as opposed to mechanisms for Sharp and other insiders to extract money out of the Debtor. See Calderone Affidavit, ¶ 29 and Exhibit "I" thereto.

35.     In addition to the above, the Debtor's books and records include significant accounting irregularities, some of which the Debtor has agreed are improper. For instance, there is a total of approximately $2,000,000 that is listed in the "Prepaid Expenses" and "A/R Other" accounts that the Debtor has not been able to explain. More problematic, however, is the Debtor's admission that at least some of this balance relates to the improper capitalization of expenses in historical periods which were used to pay employee compensation and not capitalized costs as reported. Booking operating expenses, such as payroll, to asset accounts may be indicative of fraudulent financial reporting. Moreover, the pre-paid expense account can be used to mask a wide variety of improperly classified transactions, including, but not limited to, distributions, insider compensation and personal expenses, and other non-arm's length transactions with insiders and affiliates. The only way to determine this, however, is to trace ledger entries to their requisite source documentation, a task that is impossible to perform based on the limited information the Debtor has provided. See Calderone Affidavit, ¶¶ 36-38.

---

[4] The Committee intends to investigate whether these so-called "loans" should be characterized as equity contributions instead.

I\8238892.1

### III.     ARGUMENT

**A.**     **The Debtor Has Not Proposed The Sale In Good Faith And Wholly Fails To Meet Its Burden Of Demonstrating That The Sale Is Backed By A Sound Business Justification.**

36.     "The administrative power to sell or lease property in a reorganization continue[s] to be the exception, not the rule." In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); accord In re Cloverleaf Enters., Inc., No. 09-20056, 2010 WL 1445487, at *2 (Bankr. D. Md. Apr. 2, 2010) ("[S]ales of all assets outside of a plan in a case under Chapter 11 are extraordinary and should be viewed as an exception to the rule.").

37.     To sell its assets outside the ordinary course of business, a debtor in possession must comply with section 363(b)(l) of the Bankruptcy Code, which requires "notice and a hearing."[5] "Section 363(b)(1)'s requirement that the debtor obtain judicial approval of agreements that are outside the ordinary course of business signifies a degree of congressional distrust of the contractual process in bankruptcy. The fear is that the debtor who steps out of the ordinary course of business may be harming creditors as a whole or favoring one creditor over the others without a valid ground." In re UAL Corp., 443 F.3d 565, 572 (7th Cir. 2006) (citation omitted). Consequently, "a judge determining a §363(b) application [must] expressly find from the evidence presented before him at the hearing a good business reason to grant such an application." Lionel Corp., 722 F.2d at 1071; accord In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (stating that section 363 sale involves exercise of debtor's fiduciary duties and requires "articulated business justification").

38.     Moreover, sales of substantially all of the estate's assets "are subject to special scrutiny." In re Gulf Coast Oil Corp., 404 B.R. 407, 422 (Bankr. S.D. Tex. 2009). Because

---

[5] See 11 U.S.C. § 363(b) ("The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.")

I\8238892.1

"there is some danger that a section 363 sale might deprive parties of substantial rights inherent in the plan confirmation process," courts must "closely scrutinize such sales." 3 COLLIER ON BANKRUPTCY ¶ 363.02[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Accordingly, when the debtor seeks "to obtain approval in a chapter 11 case before confirmation of a plan of a sale of substantially all of the assets of the estate," it must not only show "a sound business reason" and "that there has been adequate and reasonable notice," but also "that the sale has been proposed in good faith." Id., at ¶ 363.02[4]. "These factors are considered to assure that the interests of all parties in interest are protected and that the sale is not for an illegitimate purpose." Id.

39.    A bankruptcy court must be wary of authorizing sales that "effectively evade the 'carefully crafted scheme' of the chapter 11 plan confirmation process, such as by denying §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) rights." Gulf Coast Oil Corp., 404 B.R. at 407, 422; see also In re Cont'l Air Lines, Inc., 780 F.2d 1223, 1227-28 (5th Cir. 1986) ("Undertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan."). Although "Chapter 11 bankruptcy proceedings are frequently utilized to liquidate assets, . . . there are limits to the use of § 363, and it is clear that Chapter 11 liquidations are still subject to the proscriptions of Chapter 11 concerning, inter alia, the filing of a plan. Recognizing as much, most secured creditors understand the necessity of making some distribution available to other creditors as the price of a court-approved sale." In re Encore Healthcare Assoc., 312 B.R. 52, 57 n.10 (Bankr. E.D. Pa. 2004).

40.    Factors to consider in determining whether to approve a section 363(b) sale before confirmation of a chapter 11 plan include: (1) "Are the fiduciaries that control the debtor truly

I\8238892.1

disinterested?"; (2) "Is there evidence of a need for speed?"; (3) "Does the proposed sale include all of a debtor's assets and does it include the 'crown jewel'?"; (4) "Have the assets been aggressively marketed in an active market?"; (5) "Is the proposed APA sufficiently straightforward to facilitate competitive bids or is the purchaser the only potential interested party?"; (6) "Who will benefit from the sale?"; (7) "What is the business justification?"; and (8) "Was the hearing a true adversary presentation?  Is the integrity of the bankruptcy process protected?" Gulf Coast Oil Corp., 404 B.R. at 423-28.[6]

41.    Upon consideration, every one of these factors mandates denial of the Proposed Sale.

### 1.    Sharp's Self Interest Is Driving The Proposed Sale, In Total Breach Of His Fiduciary Duties.

42.    "A debtor-in-possession owes a fiduciary duty to maximize the value of the estate to all its creditors." In re Big Rivers Elec. Corp., 233 B.R. 739, 751 (W.D. Ky. 1998); see also Schipper, 933 F.2d at 515 (debtor in possession "owe[s] fiduciary duty to unsecured creditors" and is "required to meet the standards of Section 363").  Accordingly, "[w]hen a debtor or trustee conducts a sale under § 363(b), it has an obligation to maximize revenues for the estate." In re S.N.A. Nut Co., 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995).  "This duty to maximize the estate often trumps other duties the debtor may owe to individual creditors or third parties." Big Rivers Elec. Corp., 233 B.R. at 752.  Transactions that would benefit insider management – in conflict with their fiduciary duties – are necessarily "subject to heightened scrutiny." In re Family Christian, LLC, 533 B.R. 600, 627 (Bankr. W.D. Mich. 2015); see also In re LWD, Inc., 332

---

[6] See also In re Brethren Care of S. Bend, Inc., 98 B.R. 927, 933 (Bankr. N.D. Ind. 1989) (following Lionel's phrasing of the relevant factors as including "the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value").

I\8238892.1

B.R. 543, 555 (Bankr. W.D. Ky. 2005) (stating that transactions involving insider fiduciaries "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse" (internal quotations marks and citations omitted)), aff'd, 340 B.R. 363 (W.D. Ky. 2006).

43.    For example, the bankruptcy court denied a sale motion in Cloverleaf, 2010 WL 1445487, based upon its finding that "the Debtor proposed a sale that primarily benefits its sole shareholder, CSOA, while providing woefully inadequate notice of this sale to all other parties. In so doing, it fell short in carrying out its duty to act as a fiduciary for all creditors and interest holders."  Id. at *4; compare In re Schipper, 933 F.2d at 515 (finding no breach of fiduciary duty in sale of assets to debtor's parents where sale carried "all the earmarks of an arm's length transaction":  "the price was based on an independent appraisal; all the creditors received adequate notice of the details of the proposed sale, including the relationship between buyer and seller; and a hearing was held at which all of the creditors were given an opportunity to object").

44.    The circumstances surrounding the Proposed Sale all confirm that Sharp has abandoned the Debtor's duty to maximize value for the Estate in pursuit of a quick asset sale that will reduce his liability on his Guaranty under the terms of the Settlement Agreement.  *First*, the Debtor has not presented any evidence that it conducted a marketing effort, nor any appraisal justifying the Sale price.  *Second*, the Debtor has agreed to an APA that precludes competitive bidding.  *Third*, the Debtor has sought to push the Proposed Sale through on shortened notice between Christmas and New Year's, depriving other potential purchasers of the time to examine the Facility in operation.  *Finally*, although the Debtor justifies the sale as preserving a going concern, it seeks to sell the Facility and Assets at fire sale liquidation prices.  Even under regular – much less heightened – scrutiny, these circumstances all mandate denial of the Proposed Sale as a breach of the Debtor's fiduciary duty.

I\8238892.1

**2.      The Debtor Has Presented Zero Evidence Of A Need For Speed.**

45.      One of the "most important" factors to consider with regard to a requested sale is "whether the asset is increasing or decreasing in value."  Lionel Corp., 722 F.2d at 1071.  "The case law under section 363's statutory predecessors used terms like 'perishable,' 'deteriorating,' and 'emergency' as guides in deciding whether a debtor's property could be sold outside the ordinary course of business.  The use of such words persisted long after their omission from newer statutes and rules."  Id. at 1070-71; see also Gulf Coast Oil Corp., 404 B.R. at 423 ("Not every sale is an emergency"; proper justifications for a section 363 sale include the need "to sell 'perishable assets'" or "to avoid adverse, but looming, market or business conditions"); see, e.g., In re Med. Software Solutions, 286 B.R. 431, 441 (Bankr. D. Utah 2002) (approving sale based on evidence of "a substantial decrease in value if the assets are not sold immediately").

46.      The Debtor has presented absolutely no evidence that the Facility and/or Assets will decrease in value if not sold immediately.   And, even if it had, *since the Proposed Sale is for rock-bottom liquidation prices, it would not matter*.  The value of the Facility and/or Assets simply cannot fall below the Proposed Sale price in the month or so it would take to market them properly and hold a public auction in Court.

**3.      The Proposed Sale Includes The Debtor's Crown Jewel Assets.**

47.      As explained above, the Proposed Sale includes the Facility and all associated Assets – what the Debtor considers to be its most profitable, "Shop 1" asset group.  See Calderone Affidavit, ¶ 12.

**4.      The Assets Were Not Marketed At All, Much Less Aggressively: The Proposed Sale Is "Private" And The APA Forbids Competitive Bidding.**

48.      Because "[a] central purpose of bankruptcy . . . is to maximize creditor recovery," Corp. Assets, Inc. v. Paloian, 368 F.3d 761, 767 (7th Cir. 2004), to obtain approval of a

I\8238892.1

requested section 363 sale, "a debtor must demonstrate that the proposed purchase price is not only the highest offer, but the highest and best offer." Family Christian, 533 B.R. at 626-27 (citing cases). "The principal justification for § 363(b) sales is that aggressive marketing in an active market assures that the estate will receive maximum benefit. Established public auction markets provide the best assurance of full value at any given time." Gulf Coast Oil Corp., 404 B.R. at 424.

49.    Emphasizing that aggressive marketing is a prerequisite to section 363 asset sales, the bankruptcy court in In re Duro Indus., Inc., No. 02-16131-CJK, 2002 WL 34159091, at *5-7 (Bankr. D. Mass. Oct. 7, 2002), vacated its order approving an asset sale where subsequent evidence revealed that "[t]he Debtor and the Lender had not, at any time in the case, intended to conduct a serious marketing effort as to the Debtor's business. . . .  The Debtor did not hire a broker, an investment banker, or a professional of any sort with knowledge of how these assets should be marketed." Id. at *6.

50.    As discussed in Section II.C above, the Debtor has offered no evidence of any marketing effort, much less a serious one.   Indeed, it was only a month ago – after Sharp entered into the Settlement Agreement, rewarding him for quickly selling off the Bank's Collateral – that the Debtor shelved its plan to reorganize and decided to liquidate instead.  And even if the Debtor could be excused for presenting the Proposed Sale without market testing (it cannot), there is no excuse for its agreeing to prevent competitive bidding in Court.

51.    For example, the district court in Big Rivers Elec. Corp., affirmed the denial of a proposed sale where the APA contained a provision that prohibited the debtor "from initiating, soliciting, or negotiating offers and proposals for the sale or lease of its assets" and prevented it from "entertain[ing] any competing offer that may bring a higher price for its assets."  233 B.R.

at 743, 752.  Plainly, such a "No Shop Clause interferes with [the debtor's] fiduciary duty" to maximize value for the estate.  Id. at 752; see also Cloverleaf, 2010 WL 1445487, at *3 (denying requested sale where "[w]hat the Debtor did here is to decide . . . that it would sell out to [buyer] Mr. Vogel.  To that end, it negotiated an agreement that precluded the marketing of its assets to anyone else.").  Hence, the APA's ban on competitive bidding alone requires the Proposed Sale's denial.

52.    Furthermore, "courts generally compare the proposed sale price against the appraised value of the property to determine the reasonableness of the winning bid." In re Hart's Mfg. Co., Inc., 383 B.R. 720, 725 (Bankr. W.D. Tenn. 2008).

53.    While the Debtor presented no appraisals supporting the Asset Sale price of $860,000, the Asset Appraisal available to the Committee assigns gross orderly and forced liquidation values of at least $1,488,650 and $1,133,230, respectively, to these same Assets. And while the APA values all of the Debtor's inventory at $.04/lb. – a price that, at best, barely exceeds current "scrap" rates – the difference between the Debtor's book value of raw material inventory and raw material inventory at $.04/lb. pricing is a staggering $1,273,506.13.  Finally, the Real Estate Appraisal values the associated real estate at $1,294,000, compared to the $750,000 price that the Buyer's affiliate is prepared to pay Z&S as a condition of the Proposed Sale.

54.    In sum, the Proposed Sale must be denied for falling far short of maximizing value for the Estate.  Based on price alone, the Debtor could not have proposed it in good faith.

55.    Notably, the purchaser must also have acted in good faith to deserve the protections against a reversal on appeal given in section 363(m).[7]

---

[7] See 11 U.S.C.A. § 363(m) ("The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to

I\8238892.1

56.    As the Seventh Circuit explained, "[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings." In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978). "[T]he misconduct that would destroy a purchaser's good faith status at a judicial sale" includes "an attempt to take grossly unfair advantage of other bidders." Id.; see, e.g., In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 149 (3d Cir. 1986) (remanding to bankruptcy court to determine whether buyer and debtor (through its self-interested principal) "colluded in an attempt to take unfair advantage of prospective bidders").

57.    Here, the Debtor's total lack of marketing effort, combined with its agreement to a private sale at a fire-sale price that forbids competitive bidding demonstrates collusion with the Buyer in "an attempt to take unfair advantage of prospective bidders." Abbotts Dairies, 788 F.2d at 149. Neither the Debtor (through its self-interested principal, motivated to receive a release of his personal liability under the terms of the Settlement Agreement) nor the Buyer (in its effort to obtain the protections of section 363 while circumventing the requisite competitive process) have acted in good faith.

### 5.    The Proposed Sale Benefits Only Sharp And The Bank.

58.    "It is well settled that it is improper for a bankruptcy trustee to liquidate property solely for the benefit of secured creditors." In re Integrated Agri, Inc., 313 B.R. 419, 425 (Bankr. C.D. Ill. 2004). Thus, "in order to sell the estate's most important asset, the trustee in a Chapter 11 proceeding must demonstrate 'some articulated business justification, *other than appeasement of major creditors.*'" In re Terrace Chalet Apartments, Ltd., 159 B.R. 821, 830 (N.D. Ill. 1993) (quoting Lionel, 722 F.2d at 1070) (emphasis added by district court). This

---

an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.").

follows from the self-evident fact that "[a]ppeasement of the loudest creditor does not constitute a good business reason." 3 COLLIER ON BANKRUPTCY ¶ 363.02[4].

59.    To the contrary, "[t]he § 363(b) movant should be prepared to prove, not just allege, why it is appropriate to provide extraordinary bankruptcy authority and remedies solely for the benefit of a party whose contract under state law does not provide those remedies and benefits. And if the proposed transaction will not even pay all of the expenses of the bankruptcy proceeding, it would be especially difficult to understand why the [bank] should get the benefit of extraordinary bankruptcy powers and remedies for which it did not pay." Gulf Coast Oil Corp., 404 B.R. at 427-28 (denying requested sale where "[t]he only effect of the bankruptcy process would be to transfer the debtors' assets to its secured creditor with benefits that the creditor could not achieve through foreclosure").

60.    In Encore Healthcare Assoc., for example, the bankruptcy court denied a sale motion where "the proposed sale not only generates funds solely for the secured creditor which could realize the value of its collateral by foreclosing and selling the assets itself but more significantly advances no purpose of a Chapter 11 proceeding." Id. at 57-58. Like the Debtor here that seeks to abandon its remaining assets and dismiss its case, the Encore debtor "intend[ed] to convert to a case under Chapter 7 after the sale is consummated." Id. at 57.

61.    Likewise, the bankruptcy court in Hart's Mfg., 383 B.R. at 725, denied a sale that would benefit only the undersecured creditor. Observing that "[t]he 'best interest of creditors' test is in the plural," the court could not find "that a sale which provides only partial payment to a single creditor, leaving all other creditors with nothing, could be deemed to be in the best interest of the creditors." Id. at 725; accord In re W. Biomass Energy LLC, No. 12-21085, 2013 WL 4017147, at *3 (Bankr. D. Wyo. Aug. 6, 2013) (sustaining committee's objection to

22

proposed sale as unfair where "the resulting price received from the sale only provides a partial payment to one secured creditor, leaving all unsecured creditors with nothing" and the committee otherwise "might have the possibility of successfully obtaining a "carve-out" from sale proceeds for distributions to unsecured creditors"); In re Fremont Battery Co., 73 B.R. 277, 279 (Bankr. N.D. Ohio 1987) (denying sale motion where "[t]he proposed sale would not, as a whole benefit the Debtor or creditors. In fact, if allowed, the sale would terminate Debtor's existence. . . . Additionally, the proceeds from the proposed sale would, at most, benefit one creditor only. The sale would not create proceeds that would inure to the benefit of the unsecured creditors.").

62. Chief among the benefits of bankruptcy is the ability to sell assets free and clear of certain interests. If the secured creditor seeks to take full advantage of this benefit, it must be required to "pay the freight," that is, make provision for the payment of the costs of administering the bankruptcy case and provide some recovery for other creditors, who have been taken along for the ride. "Recognizing as much, most secured creditors understand the necessity of making some distribution available to other creditors as the price of a court-approved sale." Encore Healthcare Assoc., 312 B.R. at 57, n.10; accord In re NEC Holdings Corp., Case No. 10-11890 (CSS) (Bankr. D. Del.), Tr. of July 13, 2010 Hr'g (Dkt. No. 224), at p. 100: 17-20 ("the freight is certainly an administratively solvent estate"); Family Christian, LLC, Case No. GG 15-00643-jtg (Bankr. W.D. Mich. June 18, 2015), Order Denying Motion to Sell Substantially All Assets of Debtors (Dkt. No. 932), at p. 2, ¶ 5(ii) (requiring all qualifying bids in section 363 asset sale to provide for payment of administrative claims in full).

63. For example, in Med. Software Solutions, 286 B.R. at 442-43, the bankruptcy court approved a section 363 sale to the debtor's lenders (who credit bid the value of their pre

and post-petition debt), where the sale terms ensured the payment of administrative claims and established a $100,000 fund for unsecured creditors.

64.     The Debtor here seeks to sell its Assets and Facility under the Proposed Sale for the sole benefit of the Bank – who has refused to "pay the freight" by sharing the proceeds with other stakeholders in the Chapter 11 Case.  The reason is clear:  Sharp has shirked his fiduciary duty to do the Bank's bidding instead, all with the goal of achieving the release of his personal Guaranty under the terms of the Settlement Agreement.  Not surprisingly, the Debtor has not alleged, much less proven, "why it is appropriate to provide extraordinary bankruptcy authority and remedies solely for the benefit of a party whose contract under state law does not provide those remedies and benefits."  Gulf Coast Oil Corp., 404 B.R. at 427.  Since "the proposed transaction will not even pay all of the expenses of the bankruptcy proceeding, it [is] especially difficult to understand why the [Bank] should get the benefit of extraordinary bankruptcy powers and remedies for which it did not pay."  Id.  This Court must deny the Proposed Sale "which provides only partial payment to a single creditor, leaving all other creditors with nothing," as being diametrically opposed to "the best interest of the creditors."  Hart's Mfg., 383 B.R. at 725.

**6.     The Debtor Has Not –And Cannot – Offer Any Sound Business Justification For Selling Its Assets At Fire-Sale Prices.**

65.     To begin, as is evident from the Sale Motion, Abandonment Motion, CLO Motion and Motion to Dismiss/Convert, "this debtor is no longer being reorganized; instead, this is a liquidating Chapter 11."  S.N.A. Nut, 186 B.R. at 105.  "Therefore, no particular deference should be given to the debtor's business decision."  Id.  To the contrary "[i]n a liquidating Chapter 11, more deference is shown to the unsecureds' viewpoint" because "the principle [sic] underlying rationale for the 'business judgment rule', i.e., that a DIP is entitled to some free

I\8238892.1

reign in fulfilling its perceived mission of aiding the economy . . . is lacking in such circumstances." Id. (internal quotation marks and citations omitted) (alteration in original).

66.    Moreover, as discussed supra Section III.A.1, "[w]hen a debtor or trustee conducts a sale under § 363(b), it has an obligation to maximize revenues for the estate." Id. at 104.  Indeed, "[i]n a liquidation case, the sale to the highest bidder is legally essential . . . ." DiMarco v. Flannery (In re Flannery), 11 B.R. 974, 977 (Bankr. E.D. Pa. 1981).  "To ensure compliance with those duties, a bankruptcy court is generally afforded wide latitude in deciding whether to grant or deny approval of estate asset sales.    Furthermore, in appropriate circumstances it is proper for a court to interfere with the [debtor's] judgment for the purpose of safeguarding the interest of parties concerned, such as creditors and bidders." In re Bakalis, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) (citations omitted); cf. In re Tiara Motorcoach Corp., 212 B.R. 133, 137 (Bankr. N.D. Ind. 1997) (discussing proposed break-up fee) ("A sale pursuant to § 363 of the Bankruptcy Code is not in the ordinary course of business, and the business judgment of the debtor should not be solely relied upon.  Rather, a court should insure that revenues are maximized and that the best interests of the debtor's estate, creditors and equity holders are furthered." (footnote omitted)).

67.    Here, the Debtor's only proffered justification for the Proposed Sale is that it "is expected to save a significant number of jobs in the Anderson area, preserve the tax base for the community, and preserve a viable customer for the current venders to S&S Steel."  Sale Motion, p. 4.

68.    This "justification" is simply a sham for among the following reasons:

A.    *First*, the current venders to S&S Steel, many of whom are represented on the Committee, oppose the Proposed Sale.

I\8238892.1

B. *Second*, the "significant number" of jobs preserved totals **four managers** – see Sale Motion, Exhibit A, ¶ 3.1(k). The preservation of jobs for four member of the management team cannot justify accepting fire-sale prices for the Debtor's assets. See, e.g., In re After Six, Inc., 154 B.R. 876 (E.D. Pa. 1993) (ordering highest dollar amount bid accepted over lower amount bid that included promise to employ debtors' former employees); cf. In re Prairie Coal Co., 40 F.Supp. 894 (E.D. Ill. 1941) (ordering sale to bidder that promised to employ debtor's former employees, but also submitted highest dollar amount bid).

C. *Third*, and most importantly, **if the Buyer is purchasing a going concern**, it **must pay a going concern price**. As demonstrated above, the Buyer is offering rock bottom liquidation value for the Debtor's prized Assets and Facility.

69. In fact, the Proposed Sale's highly unfavorable terms, combined with the mad rush for its approval, betray the real motivation behind it: Sharp's desire to sell the Bank's Collateral as quickly as possible and obtain a release on his personal Guarantee, as provided under the Settlement Agreement.

70. Because the Debtor has not offered any sound business justification (nor could it) for approving the Proposed Sale that fails miserably to maximize value for the Estate, the Sale Motion must be denied.

**7.    In Trying To Push Through A Private Sale On Shortened Notice And Truncated Service, The Debtor Abuses The Bankruptcy Process.**

71. As a general matter, section 363 sales held on an expedited basis are disfavored. "Proposals for quick sales, understood by only a few parties who would benefit from the sale, are inherently suspect." Gulf Coast Oil Corp., 404 B.R. at 423-24. Understandably, courts are "extremely concerned by this time-trap" caused by sale motions on shortened notice, which is "inconsistent with the Code, due process of law, the exercise of the court's authority and simple

I\8238892.1

common sense." In re Bombay Co., Inc., No. 07-44061-DML-11, 2007 WL 2826071, at *3 (Bankr. N.D. Tex. Sept. 26, 2007). "At a minimum, if section 363(b)(1) is the means for effecting a debtor's disposition, the creditors should have the luxury of enough time for their representatives to assess fully the proposed transaction." Id. at *3.

72.    Here, the Debtor has given less notice to fewer parties than the Bankruptcy Code and Rules provide. The 13 days' notice (shorted from the standard 21 days) included Christmas and New Year's, effectively leaving seven business days between filing and closing. And the Debtor notified virtually all of its 320 creditors by regular U.S. mail; only the "Service List" received expedited notice.

73.    As discussed above, the Debtor has demonstrated no "emergency" warranting shortened notice / truncated service of the Proposed Sale at below forced liquidation prices. The Committee and its constituency have not had the luxury of enough time to assess fully the proposed transaction and canvas other potential purchasers. For this reason alone, the Proposed Sale must be denied.

**B.    The Debtor Provides No Basis To Waive The Stay.**

74.    The Debtor's Sale Motion seeks to waive the application of Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order." The purpose of this rule is to "provide sufficient time for an objecting party to request a stay pending appeal before an order can be implemented. A short period of time is often needed and essential to an objecting party intending to appeal because, if the sale is closed in the absence of a stay, any appeal by an objecting party may well be moot." In re Borders Group, Inc., 453 B.R. 477, 486 (Bankr. S.D.N.Y. 2011) (quoting 10 COLLIER ON BANKRUPTCY ¶ 6004.11). Similarly,

27

I\8238892.1

Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under 365(f) is stayed until the expiration of 14 days after the entry of the order."

75.     The Debtor provides absolutely no reason for the requested waiver, much less evidence of a significant business exigency justifying waiver of the stay.  See, e.g., In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (declining to waive stay where "Debtors made no evidentiary showing of a business exigency requiring closing" within the stay period; rather, their motion merely contained a "generalized assertion that the Debtors require 'an expedited closing' after all closing conditions have been met or waived").  If the Court approves the Proposed Sale (which it should not for all the reasons given in Section III.A above), the Court must deny the Debtor's request to waive the fourteen-day stay required by Bankruptcy Rules 6004(h) and 6006(d).

## IV.    CONCLUSION

WHEREFORE, for the reasons and based on the authorities cited above, the Committee respectfully requests that the Court deny the Sale Motion in its entirety.

Respectfully submitted,

By:  /s/ Sarah L. Fowler

| | |
|---|---|
| Henry A. Efroymson, Atty. No. 6427-49 | Michael G. Menkowitz (admitted *pro hac vice*) |
| Sarah L. Fowler, Atty No. 30621-49 | Paul J. Labov (admitted *pro hac vice*) |
| ICE MILLER LLP | Jason C. Manfrey (admitted *pro hac vice*) |
| One American Square, Suite 2900 | FOX ROTHSCHILD LLP |
| Indianapolis, Indiana 46282-0200 | 2000 Market Street, 20th Floor |
| (317) 236-2120 Telephone | Philadelphia, PA 19103-3291 |
| (317) 592-4257 Facsimile | Phone (215) 299-2000 |
| Henry.Efroymson@icemiller.com | Fax (215) 299-2150 |
| Sarah.Fowler@icemiller.com | mmenkowitz@foxrothschild.com |
| | plabov@foxrothschild.com |
| | jmanfrey@foxrothschild.com |

*Counsel to the Official Committee of Unsecured Creditors*

I\8238892.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 5, 2016, a true and correct copy of the foregoing was served upon the parties on the following parties *via* the Court's ECF notification system on those parties receiving electronic notification.

| | |
|---|---|
| Kayla Britton | kayla.britton@faegrebd.com |
| Jay Jaffe | jay.jaffe@faegrebd.com |
| Beth Kramer | beth.kramer@usdoj.gov |
| Jay P. Kennedy | jpk@kgrlaw.com |
| James A. Knauer | jak@kgrlaw.com |
| Harley K. Means | hkm@kgrlaw.com |
| Amanda Dalton Stafford | ads@kgrlaw.com |
| Henry A. Efroymson | henry.efroymson@icemiller.com |
| U.S. Trustee | ustpregion10.in.ecf@usdoj.gov |
| Sarah Lynn Fowler | Sarah.Fowler@icemiller.com |
| Paul J. Labov | plabov@foxrothschild.com |
| Michael G. Menkowitz | mmenkowitz@foxrothschild.com |
| Gregory Ostendorf | gostendorf@scopelitis.com |
| John Thomas Piggins | pigginsj@millerjohnson.com |

I further certify that on January 5, 2016, a copy of the foregoing was mailed by first class U.S. Mail, postage prepaid, and properly addressed to the following:

N/A

/s/ Sarah L. Fowler
Sarah L. Fowler

I\8238892.1